UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENISE HOLLAND,

        Plaintiff,                  Case No. 13-14091
                                              Hon. Victoria A. Roberts

v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. # 13) AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. # 9)**

**I.    INTRODUCTION**

This matter is before this Court on the parties' cross-motions for summary judgment. Denise Holland ("Holland") challenges a final determination by the Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance Benefits.

The Court **GRANTS** the Commissioner's Motion for Summary Judgment; and **DENIES** Holland's Motion for Summary Judgment.

**II.    SOCIAL SECURITY ACT DISABILITY BENEFITS FRAMEWORK**

Under 42 U.S.C. § 423, a wage earner suffering from a disability is entitled to disability benefits. The act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

1

for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The claimant bears the burden to prove entitlement to benefits. *Dice v. Comm'r of Soc. Sec.*, No. 12-CV-11784, 2013 WL 2155528, at *6 (E.D. Mich. Apr. 19, 2013). To determine if a person is disabled, and eligible for benefits, the Commissioner uses a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments, that significantly limits ... physical or mental ability to do basic work activities, benefits are denied without further analysis.
>
> Step Three: If plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Id. (citing* 20 CFR § 404.1520). For the first four steps, the claimant bears the burden to prove the severity of impairment and that it precludes performing work. *Spreeman v. Comm'r of Soc. Sec.*, No. 12-12641, 2013 WL 5212023, at *2 (E.D. Mich. Sept. 16, 2013). At the fifth step, the burden shifts to the Commissioner to show that other jobs exist in the national economy that the claimant is qualified to perform despite impairment. *Id.* To meet this burden, the Commissioner's decision must be supported by substantial evidence. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th

2

Cir. 1987). Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays the claimant's individual physical and mental impairments. *Id.*

### III.     BACKGROUND AND ADMINISTRATIVE HISTORY

#### A.     Background

Holland worked as a school bus driver. She was diagnosed with breast cancer and underwent a partial mastectomy. Holland then began chemotherapy and eventually radiation treatments. As a result of the treatments, Holland suffered from many side effects; she was lethargic and had memory problems. She lost weight and suffered from numbness in her fingers and toes. Early in her recovery she relied heavily on friends and family to aid her in completing basic household tasks, such as preparing meals, doing laundry, and running errands. As time progressed Holland's condition improved. Her doctors reported that Holland tolerated her treatments well; however, she still had some residual side effects, such as numbness in her fingers and toes, sores on her feet, and headaches. Holland eventually returned to work as a bus driver; however, the numbness in her fingers and toes prevented her from being able to drive as efficiently as she once had, and her feet were unable to feel operating pedals.

On February 23, 2011, Holland filed for disability benefits. Her claim was denied on May 3, 2011. Holland proceeded to request a hearing. On February 9, 2012, Holland appeared with counsel before Administrative Law Judge ("ALJ") Kevin Fallis for the disability hearing. During the hearing, Holland testified about her impairments, and Vocational Expert ("VE") Kimberly Warner also testified.  On April 18, 2012, the ALJ

denied Holland benefits. The ALJ said Holland undoubtedly suffered from pain and difficulties due to her illness; however, she was not disabled as defined by the Social Security Act. The Appeals Council denied Holland's request for review, and the decision of the ALJ became the final decision of the Commissioner.

Holland now seeks judicial review. She says the ALJ erred because the hypothetical questions posed to the VE did not adequately represent her impairments. She also says the ALJ failed to give proper weight to the medical records of her treating physicians. Holland also claims the ALJ erred when he said Holland was not credible when she testified about the severity of her symptoms. The Commissioner says the ALJ did not commit error and the decision is supported by substantial evidence.

  B.  Administrative Record

    1.  Relevant Medical Records

Holland sought treatment from multiple doctors and specialists. In March 2010, Dr. Christopher Ash diagnosed Holland with breast cancer, more specifically, a poorly differentiated carcinoma. (Tr. 176). On April 30, 2010, Holland underwent a lumpectomy. On May 10, 2010, Dr. Ash reported that Holland's breast was healing well, and she was ready to see an oncologist. (Tr. 177). On May 24, 2010, Dr. Ash reported that Holland was doing well, "her incision is healing nicely," and "she is without other complaints." *Id.* On June 7, 2010, Dr. Ash reported that Holland was "doing really well." *Id.* On July 19, 2010, Dr. Ash reported that Holland was "in the middle of chemo and doing fairly well but looks tired." *Id.* On September 13, 2010, Dr. Ash reported that Holland was "down in the dumps," and "still hasn't really kind of worked on accepting the fact that this is what is going on with her," but "[e]xamination wise, she looks great."

4

*Id.* On October 25, 2010, Dr. Ash reported that Holland was midway through chemotherapy, and would soon begin radiation therapy. Her breasts were examined without any palpable lesions or worries. (Tr. 178). On January 10, 2011, Dr Ash reported that Holland was doing really well. *Id.*

Dr. Rizwan Danish treated Holland and reported on May 28, 2010 that Holland was recovering from surgery uneventfully. (Tr. 249 - 250). The report said Holland was "active, ambulatory and eating well." *Id.* Dr. Danish also reported that Holland's "extremity examination is unremarkable" and her "axillary wounds are well healing." The doctor did note that Holland had a "significant risk of disease recurrence because of unfavorable biologic features of the tumor...Therefore, adjuvant chemotherapy is strongly recommended to her and will improve her chance of survival significantly. Adjuvant radiation therapy after the completion of chemotherapy is also recommended." *Id.* On July 9, 2010, Dr. Danish reported Holland's appetite was fair, she was fatigued, but denied pain. (Tr. 244). On July 30, 2010, Dr. Danish reported that Holland had some lesions and discharge on her pelvic area, discharge from her eyes, constipation, but an improving appetite. (Tr. 243). On August 6, 2010, Dr. Danish reported that Holland denied pain, lesions in her pelvic area were improving, and her appetite was fair. (Tr. 242). On September 17, 2010, Dr. Danish reported that there were zero changes since Holland's visit on August 27, 2010, Holland denied pain, and her appetite was improving. (Tr. 240). On October 15, 2010, Dr. Danish reported that Holland suffered from night sweats and hot flashes. Holland also complained of numbness in her fingers, tongue, and toes. (Tr. 239). On November 5, 2010, Dr. Danish reported that Holland was in the same condition as was reported on October 15, 2010, but noted that Holland

5

denied pain, and had a good appetite. (Tr. 238). In a letter to Dr. Ash dated that same day, Dr. Danish wrote that Holland feels well, has completed chemotherapy, and is in complete clinical remission. (Tr. 247). On January 4, 2011, Dr. Danish reported that Holland was suffering from a sore throat and back pain. (Tr. 236). On February 23, 2011, Dr. Danish reported that Holland was suffering from sensitivity to lights, and some pain, but her appetite was good. (Tr. 235). In a letter to Dr. Ash dated the same day, Dr. Danish wrote Holland "continues to complain of paresthesias in the tips of her fingers and balls of her feet. She tells me that she has trouble feeling the gas pedal." (Tr. 246).

Holland consulted Dr. Haesook Kim, a radiation oncologist, for radiation treatments. The consultation report stated Holland was receiving chemotherapy and she had some numbness in her fingers and feet related to chemotherapy, but she had no other complaints and denied any other symptoms. (Tr. 276). On January 26, 2011, Dr. Kim reported that Holland "tolerated treatment very well without any unusual side effects of the treatment." And, "[a]t the conclusion of radiation treatment, she felt fine and denied any complaints." (Tr. 275). On February 25, 2011, Dr. Kim wrote that Holland was given a radiation treatment, her appetite improved, her energy level significantly improved, and she was doing well. (Tr. 274). The report noted that Holland complained of residual tingling and numbness in her fingertips and toes related to chemotherapy. *Id.* On June 29, 2011, Dr. Kim reported Holland was doing well and denied any particular complaints. (Tr. 341). The tingling and numbness of the fingertips have improved, but the symptoms in the toes remain unchanged. *Id.* Dr. Kim was satisfied with Holland's progress and said Holland will be examined again in six months and then discharged

6

from follow up care. *Id.*

### 2. Hearing Testimony

Holland testified she had a lumpectomy and underwent chemotherapy and radiation treatments. As a result, she suffered from headaches, sensitivity to light, and numbness in her hands and feet. (Tr. 39 - 40). During the closed period of April 30, 2010 to August 15, 2011, which is the time Holland was off of work, Holland had trouble going up and down stairs. (Tr. 30). She was able to do some laundry, and prepare some meals; however, while cooking she would often cut her fingers because she could not feel the knife. (Tr. 31). She testified that while doing chores she would often take breaks and nap up to six times a day. (Tr. 32). Holland said she would regularly sleep for eight hours, but sleep was disrupted due to pain. (Tr. 33). Holland also said she lost thirty pounds. *Id.* And, she had trouble concentrating and remembering things. (Tr. 42 - 43).

Holland said she was unable to lift more than five pounds, stand for more than 20 minutes, or sit or walk continuously for any period of time exceeding 30 minutes. (Tr. 40 - 41).

At one point Holland's entire foot was numb, but by the time she testified, only the ball of her foot was numb. *Id.* She also said she had a plantar's wart removed and the podiatrist did not have to numb her foot because she could not feel anything. *Id.*

Holland testified that she did not drive, so friends or family drove her. One time, while driving, she had a panic attack and had to be picked up. (Tr. 34).

Holland returned to work as a bus driver. (Tr. 35). Her employer accommodated her side effects by providing her with a specialized bus that enabled her better hand control. The employer allowed co-workers to help lift the hood of her bus while she

completed her engine inspection, and allowed her to wear extra padding under her seatbelt. (Tr. 49). Holland said she still suffered from numbness in her fingers and toes, and she was unable to feel the bus pedals. (Tr. 35). She admitted that due to her condition she should not be driving. (Tr. 52).

### 3. Hypothetical Questions and Vocational Expert

The ALJ proposed four hypothetical questions to VE Kimberly Warner. The first hypothetical asked what jobs would be available to a person who would be able to perform:

> at the light level which is lift up to 20 pounds occasionally, lift, carry up to ten pounds frequently, stand, walk for about six hours and sit for up to six hours in an eight hour work day with normal breaks. This individual can never operate foot controls with either lower extremity. [She] can never climb ladders, ropes or scaffolds, [She] could occasionally climb ramps or stairs, occasionally perform balancing, stooping, kneeling, crouching, and crawling. [She] would be limited bilaterally to frequent handling and fingering of objects and limited to frequent feeling bilaterally. [She] would have to avoid all exposure to unprotected heights. Additionally, work would be limited to simple, routine, repetitive tasks performed in a work environment free of fast paced production requirements involving only simple work related decisions and routine work place changes.

(Tr. 55). The VE said such a person could work as an information clerk, counter clerk, and an office helper. (Tr. 56).

The second hypothetical contained the same limitations as the first hypothetical except the person would be limited to sedentary work, which means the person could lift up to ten pounds occasionally, stand, walk for two hours, and sit for up to six hours in an eight hour work day with normal breaks. *Id.* The VE testified there would be work as a credit checker, document preparer, and a visual surveillance system monitor. (Tr. 56 -

8

57).

In hypothetical three, the individual would be limited "bilaterally to only occasional handling and fingering of objects and feeling of objects." (Tr. 57). The VE testified that the jobs available would be information clerk, counter clerk, visual surveillance system monitor, and credit checker. (Tr. 58).

In hypothetical four the person would be limited to "handling, fingering and feeling to never," which the VE testified would result in the elimination of all jobs except visual surveillance system monitor. *Id.*

In hypothetical five, the person would be off task 20% of the time. (Tr. 58). The VE testified that would preclude all employment. (Tr. 58 - 59).

In hypothetical six the individual would be absent from work for two days a month due to symptom side effects, and doctor visits. (Tr. 59). The VE testified all employment would be precluded. *Id.*

### C. ALJ Findings

The ALJ applied the five-step sequential analysis, and concluded that Holland was not disabled.

At step one, the ALJ found that Holland has not engaged in substantial gainful activity since April 29, 2010.

At step two, he concluded Holland suffered from multiple severe impairments: status post left breast cancer with radiation and chemotherapy with residual neuropathy of toes and fingers and headaches.

At step three, the ALJ found Holland does not have an impairment or combination of impairments that meets or medically equals the severity of one of the

listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, he found Holland was unable to perform past relevant work, but her residual functional capacity allowed her to perform light work with some limitations. Holland could never operate foot pedals with the bilateral lower extremities. She could never climb ladders, ropes, or scaffolds. She was limited to occasional climbing of ramps or stairs, and occasional balancing, stooping, kneeling, crouching, and crawling. She could frequently handle objects, fingering, and feeling. She should avoid exposure to excessive vibration, use of moving machinery, and exposure to unprotected heights. And, the ALJ limited her to work that is simple, routine, and repetitive. Moreover, work tasks should be performed in an environment free of past-paced production requirements, and involve only simple work related decisions with routine work place changes due to headaches and pain.

The ALJ did not believe Holland's testimony concerning the intensity, persistence, and limiting effects of her symptoms to the extent they were inconsistent with the residual functional capacity assessment. The ALJ said he believes Holland still suffers from side effects of chemotherapy and radiation: numbness and headaches. However, those side effects were not interfering with Holland's ability to perform work tasks. The ALJ notes, Holland testified that after chemotherapy she was unable to write or hold a pen, but she was able to fill out the lengthy handwritten Headache Form and Function Report. The ALJ gave great weight to Dr. Kim's February 23, 2011, report that stated Holland was in complete remission. And, the ALJ considered the April 4, 2011, Function Report which said Holland could prepare meals, clean, shop, wash dishes, walk, drive, and ride in a car. Moreover, the ALJ gave weight to other medical reports,

10

such as the June 29, 2011, report that said Holland was doing well and had no complaints.

At step five, based on the testimony of the VE, and after considering Holland's age, education, work experience, and residual functional capacity, the ALJ found that there are jobs that exist in significant numbers in the national economy that Holland can perform, such as an information clerk, counter clerk, and office helper.

## IV. STANDARD OF REVIEW

A person may seek judicial review of any final decision of the Commissioner of Social Security; however, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (*citing Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence exists when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could also support the opposite conclusion. *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). And, if the Commissioner's decision is supported by substantial evidence, it must stand, regardless of whether the Court would resolve the disputed facts differently. *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993)

"In determining whether the Secretary's factual findings are supported by substantial evidence, a court must examine the evidence in the record taken as a whole, and take into account whatever in the record fairly detracts from its weight."

*Id.* (citations omitted). Thus, in reviewing the Commissioner's decision, the court may consider only the record that was before the ALJ, and cannot review the evidence *de novo*, weigh the evidence, or make credibility determinations.  *See*, *id.*

## V.   ANALYSIS

### A.   Hypothetical

Holland challenges the hypothetical posed to the VE and relied upon by the ALJ. She says the hypothetical does not consider all of Holland's limitations; therefore, the VE's testimony does not constitute substantial evidence. But, Holland fails to identify which medical impairment was omitted from the hypothetical, or how the hypothetical is deficient in describing her limitations.

The Sixth Circuit stated that "issues which are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). *See also*, *Dice*, 2013 WL 2155528, at *7 ("It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to ... put flesh on its bones... This court need not make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments.")(citations omitted). Holland cannot simply claim that "[b]ecause each element of the hypothetical does not accurately describe [Holland] in all significant, relevant respects, the VE's testimony at the hearing should not constitute substantial evidence." Holland has to identify for the Court what exactly was inaccurate or insufficient about the hypothetical in order for it to make a ruling. Since Holland fails to identify how the hypothetical fails to describe Holland, the Court deems this argument waived.

However, even if the argument was not waived, the Court finds there is substantial evidence to support the hypothetical questions. The ALJ said Holland suffered from "status post left breast cancer with radiation and chemotherapy with residual neuropathy of toes and fingers and headaches." Each hypothetical posed to the VE took into account Holland's foot limitations by eliminating the operation of foot pedals, and eliminating the climbing of ladders, ropes, and scaffolds. The hypothetical limited Holland to occasional climbing of stairs, ramps, crawling, stooping and balancing. The ALJ limited the hypothetical scenario to work that is simple, routine, and repetitive in order to accommodate her headaches and pain. (Tr. 16). Moreover, although the ALJ ultimately found Holland's testimony regarding her hand limitations not credible, he did propose two hypothetical scenarios that represented her hand capabilities. One hypothetical limited the individual to occasional handling and fingering of objects, and another hypothetical limited the individual to frequent handling and fingering of objects. Both scenarios produced jobs in the national economy. Thus, the hypothetical scenarios were representative of Holland's impairments.

### B. Treating Physicians' Opinions

Holland says the ALJ erred when he improperly disregarded the medical records of her treating physicians. If a treating physician's opinion concerning the nature and severity of a claimant's impairment is well-supported by the medical record, and it is not inconsistent with the other substantial evidence, the Commissioner will give the opinion controlling weight. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)). However, the Commissioner is not bound to adopt the opinions of a treating physician when the physician simply documents the claimant's

symptoms and makes no assertion that the claimant's impairments rendered her unable to perform work functions. *Walters*, 127 F.3d at 530. The ALJ may reject the opinion of a treating physician when good reason is found in the record to do so. *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800 (6th Cir. 2004). *See also, id.* ("The ALJ rejected [the treating physician's] assessment because it was inconsistent with other medical evidence of record, [claimant's] restrictions were not found anywhere in his treatment records... and there is no indication the ALJ relied on the assessment of the two state agency physicians as his basis for disregarding [the treating physician's] opinion.").

Holland's treating physicians noted that Holland complained of numbness in her fingers and toes, but none said Holland's ailments were so severe and disabling as to preclude her from performing work activities. *See also, Walters*, 127 F.3d at 530. ("[claimant] is unable to direct this court to any portion of [treating physician's] records which support the claim that his impairments are disabling."). In fact, the ALJ noted that "no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment." (Tr. 41). Instead, there is medical evidence that supports the conclusion that Holland was doing well and had a healthy prognosis. For instance, Dr Ash reported that Holland was doing really well. (Tr. 178). And, Dr. Kim reported that Holland tolerated treatment very well without any unusual side effects, and that her energy level improved. (Tr. 274). In addition, Dr. Kim reported that although there was residual tingling and numbness in the fingertips and toes, Holland denied any particular complaints. (Tr. 341). Moreover, the tingling and numbness of the fingertips had improved *Id.* Thus, the ALJ did not erroneously discredit the treating physicians'

opinions; rather, the ALJ relied on the treating physicians' reports, and their lack of indication that Holland's symptoms were severe, to come to his conclusion. The ALJ did not err.

### C.  Credibility Assessment

Holland says the ALJ erred when he rejected Holland's testimony about the intensity and severity of her symptoms as "not credible." Holland says her testimony is supported by medical evidence on record. For example, Holland identifies a medical record from March 2010, which says Holland came in "with a breast mass in her left breast" and that it hurts to touch. She also relies on a record from October 2010 that says Holland was undergoing chemotherapy and would begin radiation. Moreover, she relies on a record from April 2010, which says Holland suffered from a "left partial mastectomy with sentinel lymph node biopsy. And finally, Holland points to a record that says she has a significant risk of disease recurrence due to unfavorable biological features of the tumor.

Courts are deferential to an ALJ's credibility assessment because an ALJ is in the position to observe a witness's demeanor and credibility; however, a credibility assessment must be supported by substantial evidence. *Walters*, 127 F.3d at 531. Discounting the credibility of a claimant to a certain degree is appropriate when the ALJ finds contradictions among the medical records, claimant's testimony, and other evidence. *Id.* at 532. Moreover, an "ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments." *Id.*

The ALJ did not err when he found Holland's testimony concerning the severity of

her symptoms to be less than credible. The ALJ's credibility assessment is supported by substantial evidence. The ALJ gave great weight to Holland's own medical records, such as the fact that Holland was in complete remission, and the subsequent records which indicate she was doing well and had no complaints. He found Dr. Kim's June 29, 2011 report particularly persuasive. Moreover, the ALJ examined Holland's Function Report and noted that while Holland stated she was unable to write with a pen, she was able to handwrite the Function Report and Headache Report. In addition, the ALJ considered Holland's activities. He noted she was able to clean, shop, do laundry, wash dishes, prepare meals, walk, drive, ride in a car, and complete work activities. Ultimately, the ALJ found that although Holland was unable to perform past work, she could perform other work. Therefore, the ALJ's credibility assessment and decision were supported by substantial evidence.

## VI.     CONCLUSION

The Commissioner's decision is supported by substantial evidence. The Court **GRANTS** the Commissioner's Motion for Summary Judgment; and **DENIES** Holland's Motion for Summary Judgment.

**IT IS ORDERED.**

                                            S/Victoria A. Roberts
                                            **Victoria A. Roberts**
                                            **United States District Judge**

**Dated:  January 15, 2015**

**The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on January 15, 2015.**

**S/Carol A. Pinegar**
**Deputy Clerk**